# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITEDHEALTH GROUP, INC., a Delaware Corporation, and<br><br>UNITED HEALTHCARE SERVICES, INC., a Minnesota Corporation,<br><br>                 Plaintiffs,<br>v.<br><br>LORE HEALTH LLC, a Delaware Limited Liability Company,<br><br>LORE HEALTH ACO, LLC, a Delaware Limited Liability Company,<br><br>SEQUELAE, INC., a Delaware Corporation,<br><br>SEQUELAE LLC, a Delaware Limited Liability Company, and<br><br>JOHN DOES 1-10,<br><br>                 Defendants. | Case No. 23-cv-3906<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs UnitedHealth Group, Inc., a Delaware Corporation, and United HealthCare Services, Inc., a Minnesota Corporation (collectively, "United"), for their Complaint against Defendants Lore Health LLC, a Delaware Limited Liability Company, Lore Health ACO, LLC, a Delaware Limited Liability Company, Sequelae, Inc., a Delaware Corporation, and Sequelae LLC, a Delaware Limited Liability Company (collectively, "Lore Health"), allege as follows:

1

## INTRODUCTION

United is a worldwide leader in diabetes management. Since at least 2009, United has created innovative programs designed to help type-2 diabetics manage their condition through lifestyle interventions. Over the years, United has created substantial intellectual property in this space, most recently with Level2, a first-of-its-kind platform that combines care-team support, a delegated-risk program, and no-cost wearable technology, among other features, to empower people living with type-2 diabetes to live healthier lives.

In July 2021, Ken Ehlert, United's former Chief Scientific Officer, and Mark Pollmann, the former Chief Technology Officer of Optum Labs, a United affiliate, left the company. In October 2021, Pollmann surreptitiously pressured his former United subordinate to personally hand him approximately half a million of United's highly sensitive emails and related files—including a number relating to United's diabetes management programs—on a hard drive. These documents included a substantial volume of United's confidential information and trade secrets. Shortly thereafter, Ehlert and Pollmann set up a series of entities, including shell companies, such as "Health Stealth Co," Sequelae, Inc., Sequelae LLC, "Sequelae, DBA Lore Health," Lore Inc., "Lore Café Lounge," Lore Health ACO LLC, RCC Lore Healthcare, LLC, and Lore Health LLC. On information and belief, these companies were designed to profit off United's confidential information and trade secrets.

Once United discovered their misconduct, Ehlert and Pollmann tried to cover their tracks. Over the course of 2023, Pollmann erased incriminating information. The Lore Health website was altered, and the Sequelae website was disabled.

Through this lawsuit, United seeks to stop Lore Health from irreparably harming United through this unlawful behavior. In the event harm cannot be averted, United asks to be made whole for (1) any damages Lore Health has caused and (2) unjust enrichment Lore has received through the theft of United's confidential information and trade secrets.

## PARTIES

1.      Plaintiff UnitedHealth Group, Inc. ("UHG") is a corporation organized under the laws of the State of Delaware, having its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343. UHG owns both its own intellectual property and the intellectual property of its subsidiaries.

2.      Plaintiff United HealthCare Services, Inc. ("UHS"), is a corporation organized under the laws of the State of Minnesota, having its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343. UHG purchased Ehlert and Pollmann's company, Savvysherpa, in late 2017, and as part of that transaction, Ehlert and Pollmann agreed to certain restrictive covenants. UHS employed Ehlert and Pollmann from 2018 until mid-2021.

3.      Defendant Lore Health LLC is a limited liability company organized under the laws of the State of Delaware. Lore Health LLC's principal place of business is in Minnesota. Lore Health LLC has also gone by the names "Health Stealth Co" and "Gather Health."

4.      Defendant Lore Health ACO, LLC, is a limited liability company organized under the laws of the State of Delaware with its location identified as the San Diego office of the law firm Quarles & Brady. But as with Lore Health LLC, its real principal place of

business is in Minnesota. In fact, Lore Health ACO, LLC, is not even registered to do business in California.

5.      Defendant Sequelae LLC is a corporation organized under the laws of the State of Delaware. According to its Utah registration as a foreign corporation, Sequelae LLC's principal place of business is located at 500 IDS Center 80 South 8th Street, Minneapolis, Minnesota, 55443. The sole manager of Sequelae LLC is identified as Mark Pollmann of Brooklyn Park, Minnesota.

6.      Defendant Sequelae, Inc., is a Delaware corporation that purports to have its principal address at a law firm in San Diego, California. But its mailing address in its California registration as a foreign corporation is PO Box 431002, Minneapolis, Minnesota, 55443. The registration notes that mail should be sent to the attention of Mark Pollmann in Minneapolis. On information and belief, Sequelae, Inc., is operated out of Ehlert and Pollmann's homes in Minnesota and has its principal place of business in Minnesota.

7.      John Does 1-10 are: (a) other sham entities created by or at the direction of Ehlert and Pollmann, and may include Lore Inc., a Minnesota corporation, Lore Café Lounge (the incorporator of Lore Inc.), "Health Stealth Co," RCC Lore Healthcare, LLC, a Utah limited liability company, Sequelae PH Inc., and Lore Health PH Inc; or (b) those who have conspired with Lore Health to violate United's rights.

## JURISDICTION AND VENUE

8.      This is a civil action for trade secret misappropriation arising under federal law in violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq. ("DTSA"); trade secret misappropriation in violation of the Minnesota Uniform Trade Secrets Act, Minn. Stat. § 325C.01-.08; and tortious interference with contract, unjust enrichment, and unfair competition under the common law of the State of Minnesota.

9.      The Court has federal-question jurisdiction because the DTSA claim arises under federal law and federal law creates a private cause of action. The Court has supplemental jurisdiction over the state-law claims because they are supplemental to the federal claim under 28 U.S.C. § 1367.

10.     Venue is proper in the United States District Court for the District of Minnesota pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to United's claims occurred in this district and both United and Lore Health are "at home" in this district.

11.     The Court has personal jurisdiction over Defendants because (a) Lore Health's activities in Minnesota are so continuous and systematic as to render it "at home" in the forum state, and (b) Lore Health has purposely availed itself of conducting business in Minnesota and Plaintiffs' claims arise out of and relate to Lore Health's contacts in Minnesota.

## FACTS

### I.   United Is a Leader in Diabetes Care Management.

12.     United is a renowned leader in providing managed healthcare services to patients, with a broad portfolio of health plans and patient programs designed to address a myriad of health conditions.

13.     Among other long-term innovative initiatives, United has been at the forefront of developing healthcare solutions for patients with diabetes, which affects more than 37 million people and is the eighth leading cause of death in the United States. *See* Diabetes Fast Facts, Centers for Disease Control and Prevention, *available at* [Diabetes Quick Facts | Basics | Diabetes | CDC](#).

14.     Since at least 2009, United has contributed to and invested significantly in the development of robust, evidence-based diabetes solutions, including, but not limited to, diabetes plan designs, care models, and enhanced services. For example, the National Institutes of Health observed:

> In 2009, UnitedHealthcare (UHC) introduced the first Diabetes Health Plan (DHP), a condition-specific plan based on principles of value-based health insurance benefit design. The DHP includes financial incentives to encourage patient engagement in evidence-based diabetes care, including reduced or eliminated out-of-pocket patient expenses for diabetes-related physician visits; free diabetes self-monitoring training and supplies; and reduced or eliminated out-of-pocket expenses for diabetes-related medicines. The DHP also provides access to diabetes-specific telephone case management as well as other online resources. Additionally, the DHP provides scorecards with reminders to complete health maintenance activities, such as biannual hemoglobin A1C and cholesterol screening, and an annual retinal eye exam. Overall, the DHP provides between USD 150 and 500 in annual out-of-pocket savings for enrollees.

Narain KDC, et al., *The Diabetes Health Plan and Medication Adherence Among Individuals With Low Incomes*, Health Serv. Res. 2022 Dec.; 57 Suppl. 2 *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9660410/.

15.     In 2010, United published a seminal working paper called "The United States of Diabetes." That paper set forth the challenge: "By the end of this decade, diabetes will likely affect 15 percent of American adults – that's around 39 million people. The human costs and economic consequences will be substantial." It identified relevant research: "There is now a sufficiently large evidence base about interventions that can make a difference, ranging along the spectrum from lifestyle-related changes to cut obesity, through to targeted support for patients with diabetic-related complications." And it proposed a solution involving "health plans acting not only as payers of health benefits, but as 'care system animators,' providing underlying data, technology and care management services," suggesting "a focus not only on the 'flow' of health care consumption, but on managing the 'stock' of population health risk." *The United States of Diabetes*, UnitedHealth Center on Health Reform & Modernization (Nov. 2010) (emphasis added).

16.     United's efforts continued through a brick-and-mortar diabetes program with the YMCA called "Not Me" and expanded into the virtual delivery of a diabetes prevention program. It also launched personalized, virtual weight-loss programs through an initiative known as "Real Appeal."

17.     United's years of diabetes research and development laid the foundation for Level2, United's first-of-its-kind platform that combines care team support, delegated-risk

platforms, and no-cost wearable technology, among other features, to empower people living with type-2 diabetes to live better, healthier lives.

18.     Level2's business model offers delegated risk platforms with guaranteed savings to commercial plans and providers for type-2 diabetics wearing DexCom continuous glucose monitors ("CGMs").

19.     Level2 seeks to deliver on the proposal set forth in the 2010 working paper, serving as "'care system animators,' providing underlying data, technology and care management services," to manage health care risk for type-2 diabetics.

## II.     Ehlert and Pollmann Join United.

20.     In December 2017, Ehlert and Pollmann sold Savvysherpa—a healthcare research & development company—to United for $46.8 million under the Equity Purchase Agreement. As a condition of that sale, they agreed to become United employees. Ehlert joined United as its Chief Scientific Officer and the Chief Executive Officer of UHG R&D (later Optum Labs); Pollmann joined UHG R&D as its Chief Technology Officer.

### A.     <u>Under the Equity Purchase Agreement, Ehlert and Pollmann Were Paid Handsomely and Transferred All of Savvysherpa's IP to United.</u>

21.     In selling Savvysherpa, Ehlert and Pollmann transferred ownership of Savvysherpa's intellectual property, including confidential information and trade secrets, to United. They further agreed that, after the Closing Date, they would hold "in strict confidence" all information concerning Savvysherpa and its related companies.

22.     Ehlert and Pollmann also agreed that, for a period of five years following the Closing Date, they would not

directly or indirectly, through an Affiliate or otherwise, either for [their] own benefit or for the benefit of any other Person. . ., without the prior written consent of [United], compete with United in the United States, in any manner or capacity (*e.g.*, through any form of ownership or as an advisor, principal, agent, partner, manager, officer, director, employee, employer, consultant, member of any association, lender or otherwise) in any aspect of the business of [United] as conducted and proposed to be conducted by Ehlert or Pollmann as of the Closing Date (the 'Restricted Business').

(Ex. A, EPA § 6.8(a)(i).) Likewise, for the same five-year period, Ehlert and Pollmann agreed

not to "solicit, divert, or take away, or attempt to solicit, divert or take away, the business

relating to the Restricted Business of any Person with which [Savvysherpa] has established

or is actively seeking to establish a business or customer relationship." (*Id.*)

**B.     Under Their Employment Agreements, Ehlert and Pollmann Were Paid Handsomely, Assigned All IP to United, and Agreed to Restrictive Covenants.**

23.     As a condition of signing the EPA, Ehlert and Pollmann agreed to become United employees.

24.     In entering into their Employment Agreements with United, Pollmann and Ehlert agreed to the following:

a.  They assigned to United all of their "rights, including copyrights and patent rights," to all "inventions, discoveries, processes, procedures, methods and works of authorship, whether or not patentable or copyrightable," that they conceived during their employment. (Ex. B, Ehlert Emp. Agmts. § 5.A.i; Ex. C, Pollmann Emp. Agmt. § 5.A.i.)

b.  They agreed to "not remove from UnitedHealth Group's premises any UnitedHealth Group records, documents, data, or other

property, in either original or duplicate form, except as necessary in the ordinary course of UnitedHealth Group's business." (Ex. B, Ehlert Emp. Agmts. § 5.A.vi; Ex. C, Pollmann Emp. Agmt. § 5.A.vi.)

c. They agreed to "immediately deliver to UnitedHealth Group, upon termination of employment, or any other time at UnitedHealth Group's request, all UnitedHealth Group property, including records, documents, data, and equipment, and all copies of any such property, including any records or data [they] prepared during employment." (Ex. B, Ehlert Emp. Agmts. § 5.A.vii; Ex. C, Pollmann Emp. Agmt. § 5.A.vii.)

d. They agreed "not to disclose or use [United's] Confidential Information, either during or after [their] employment with UnitedHealth Group, except as necessary to perform [their] duties or as UnitedHealth Group may consent in writing." (Ex. B, Ehlert Emp. Agmts. § 5.B; Ex. C, Pollmann Emp. Agmt. § 5.B.)

25.     In addition, by signing their Employment Agreements with United, Pollmann and Ehlert also agreed to several post-employment restrictive covenants:

a. During their employment and for 24 (Ehlert)/12 (Pollmann) months after separation, they would not engage or participate in "any activity that competes, directly or indirectly with any UnitedHealth Group activity, product, or service that [they] engaged in, participated in, or had Confidential Information about

during [their] last 36 months of employment with UnitedHealth Group." (Ex. B, Ehlert Emp. Agmts. § 5.D.ii(a); Ex. C, Pollmann Emp. Agmt. § 5.D.ii(a).)

b.  For the same time period, they would not solicit or conduct business with (or assist others to do the same) any provider, customer, or prospective provider or customer within the 12 months before their separation of employment with whom they "had contact regarding UnitedHealth Group's activity, products or services, or for whom [they] provided services or supervised employees who provided those services, or about whom [they] learned Confidential Information during employment related to UnitedHealth Group's provision of products and services to such person or entity." (Ex. B, Ehlert Emp. Agmts. § 5.D.(a); Ex. C, Pollmann Emp. Agmt. § 5.D.i(a).)

c.  For the same time period, they would not "[r]aid, hire, employ, recruit or solicit any UnitedHealth Group employee or consultant who possesses Confidential Information of UnitedHealth Group to leave UnitedHealth Group to join a competitor." (Ex. B, Ehlert Emp. Agmts. § 5.D.i(b); Ex. C, Pollmann Emp. Agmt. § 5.D.i(b).)

d.  For the same time period, they would not "[i]nduce or influence any UnitedHealth Group employee, consultant, or provider who possesses Confidential Information of UnitedHealth Group to

terminate his, her or its employment or other relationship with UnitedHealth Group." (Ex. B, Ehlert Emp. Agmts. § 5.D.i(c); Ex. C, Pollmann Emp. Agmt. § 5.D.i(c).)

e.  And for the same time period, they would not "assist anyone in any of the activities listed above." (Ex. B, Ehlert Emp. Agmts. §§ 5.D.i(c) & ii(b); Ex. C, Pollmann Emp. Agmt. §§ 5.D.i(c) & ii(b).)

## III.   United's Competitive Advantage is Directly Related to Its Confidential Information and Trade Secret Portfolio.

26.    While employed at United, Ehlert and Pollmann were exposed to substantial confidential and trade-secret information, including in the development, launch, and operation of Level2.

27.    United's confidential information and trade secrets are among its most important assets.

28.    United has a broad portfolio of proprietary trade secrets and confidential information across its businesses and business units. United's trade secrets and confidential information include, without limitation, actuarial analyses of patient data, historical trends, and financial variables used to identify patterns and predict outcomes, leading to more accurate forecasting of healthcare needs and risk-based resource allocation; information concerning its strategies and business plans; corporate and product roadmaps; product strategies and business plans; product performance; analyses concerning product performance and opportunities; data and advanced analytics; supplier and vendor relationships and arrangements; strategic partnerships, operational methods and plans; research and development; market analyses; user data; compilations of such

information, and other competitively sensitive information that is not generally known or readily ascertainable.

29.     Separately, United may also possess information that is confidential but may not rise to the level of a trade secret. To the extent such information exists, it is protected contractually through, among other things, the employment agreements.

## IV.   United Has Invested Substantial Time, Effort, and Money to Develop Its Trade Secrets, and Has Taken Reasonable Steps to Protect Them.

30.     United's trade secrets are mission-critical, competitively sensitive information. United has developed and implemented this information through a significant investment of time, labor, and capital.

31.     United's trade secrets provide United with a strong competitive advantage at almost every level of the market, including among payers, providers, and patients. United therefore derives significant economic value and advantage from maintaining the secrecy of its trade secrets.

32.     If a competitor or potential competitor were to acquire United's trade secrets, it could, among other things, use that information to position and inform its own competitive strategies; anticipate and divert or plan around United's strategies; draw upon United's analyses to determine what products and product lines to pursue and which dead ends to avoid; more quickly develop its own competitive products and services; approach and divert United's customers, business partners and employees; and negotiate competitive arrangements. Any of these would harm United by undercutting its position in the market.

33.     Accordingly, to preserve its competitive edge, United takes proactive measures to maintain the confidentiality of its trade secrets. Among other things, United

password protects its computers and other systems; uses firewalls and anti-malware on its computers and servers; provides access to its sensitive information only to those employees with a need to know the information; requires keycard access to its office buildings and specific areas within those buildings; requires its employees to acknowledge its Code of Conduct and Employee Handbook, which contain policies regarding the maintenance of confidentiality of United trade secrets, as well as the proper use of its IT systems; requires that employees undergo periodic training on information security and trade secret protection; periodically reminds employees of their non-disclosure obligations; and utilizes employment agreements that address return of property, non-disclosure, non-competition and non-solicitation provisions.

## V.    Ehlert and Pollmann's Tenure at United.

34.    Ehlert and Pollmann misappropriated United's confidential information and trade secrets. That misappropriation was willful and malicious.

35.    As set forth below, Ehlert and Pollmann acted with (a) reckless disregard for United's rights and the rights of others, and (b) motivated by anger over Ehlert's conflicts with Level2 employees and United's senior management.

36.    According to a human resources investigation done shortly before his departure, Ehlert had created a "culture of fear" in his organization. Witnesses reported that Ehlert "[u]ses threatening, intimidating, and demeaning language towards team members. Examples included, 'I want him fired', 'You will be fired if you recommend that', 'I should take X out back and shoot them', 'We should just fire the people who are not in the office,' 'You're not an expert; you're highly replaceable,' and references to his ability to

-14-

'fire ELT and SLT leaders at-will' since they are under contract. He repeatedly diminishes clinicians, saying 'Doctors are stupid and don't know what they are doing.' Ken's leadership style is described as 'dictator'." As exemplified by the human resources report, Ehlert operated with reckless disregard for the rights of others.

37.     Ehlert's anger and reckless disregard was also demonstrated by Ehlert's derogatory treatment of members of United's senior leadership team. According to the report, "Ken is reported to have on multiple occasions used demeaning language to describe our most senior leaders of the organization. In a meeting on February 5, multiple reports were given of his disparagement of 12 executives in detail."

38.     This pattern continued while Ehlert negotiated his exit from the company. Ehlert made it clear that, if his demands were not met, he would not hesitate to sue United and attempt to involve executives at the highest reaches of the company.

39.     As part of those negotiations, Ehlert asked that United give him Level2. United declined.

40.     Thus, motivated by anger and a desire for revenge, Ehlert and Pollmann formed a plan to take United's confidential information and trade secrets and use them improperly for Lore Health's benefit.

**VI.    Ehlert and Pollmann Misappropriate United's Confidential Information and Trade Secrets.**

41.    Pollmann's last day of employment with United was July 8, 2021, and Ehlert's last day of employment was July 19, 2021. Both Ehlert and Pollmann elected to leave and knew of their employment separation date months in advance.

42.    Upon leaving United, Pollmann improperly maintained a variety of United's confidential and trade-secret documents relating to its diabetes programs.

43.    In October 2021, Pollmann made a lunch date in Minnesota with a former subordinate two levels below him. Pollmann walked away from the lunch with a hard drive containing nearly 500,000 files from United, including highly sensitive business documents containing internal United growth plans, board meeting minutes and presentations, information regarding ongoing counterparty contract negotiations, internal audit results, financial statements, and potential acquisition targets. These documents contain United's confidential information and trade secrets. A picture of the hard drive is below.



44.     The hard drive contained more than 70 .pst files with hundreds of thousands of United emails and documents, including the five .pst files of Ehlert, Pollmann, and other former Savvysherpa employees. Forensic analysis shows approximately 491,987 total documents, including, but not limited to, 313,702 emails and 118,354 attached files.

45.     The email, folders, and documents, i.e., electronically stored information ("ESI") surreptitiously obtained and retained by Pollmann included emails and attachments sent and received: (i) before the EPA while Ehlert and Pollmann were employed at Savvysherpa and (ii) during their years of employment at United following the EPA, including emails with a "uhg.com" extension.

46.     Upon information and belief, Ehlert directed Pollmann to capture this ESI.

**VII.    Ehlert and Pollmann Disclose United's Confidential Information and Trade Secrets.**

47.     Between August and December 2021, Pollmann (with Ehlert's knowledge and approval) began sending large numbers of United documents regarding its diabetes programs to Scott Schneweis, a former Vice President of Communications at Optum Labs and a current Lore Health employee.

48.     Among the emails Pollmann forwarded to Schneweis (copying Ehlert) were the following:

        a.     2019 financial forecast models, portfolio summaries, diabetes project "insights", investment decks, business plans and strategies.

        b.     Research analysis marked "Confidential Information of Savvysherpa or its clients, subject to nondisclosure and

confidentiality agreement. Do not distribute or reproduce without written permission of Savvysherpa."

c.     A January 2018 Glucose Management Program Advisory Board Kick-Off slide deck, containing an overview of the then-nascent CGM business, and an overview of its "future-state program" and vision.

d.     A 60-page "coaching conversation guide" for use by call center employees interfacing with CGM participants.

e.     A United Glucose Management Program overview and status update slide deck, including program design, pilot project learnings, and detailed commercialization plan, data stream diagram, pilot program overview, recruitment brochure, enrollment forms, device set-up instruction forms, and exemplary glucose monitoring report to physicians. This document is labeled, "Proprietary information of United Health Group. Do not distribute or reproduce without express permission of UnitedHealth Group."

49.     These documents contain or constitute United confidential information and trade secrets.

50.     The United confidential information and trade secrets that Ehlert and Pollmann misappropriated include much of the core information necessary to re-boot Level2 as Lore Health outside of United. These include information regarding (a) the nature

of the business case for Level2, (b) the means and manner of operationalizing the business opportunity, (c) financial, organizational, and strategic planning documents, (d) data insights and analysis, (e) clinical data, interventions, and micro-interventions, and (f) actuarial and pricing documents.

51.     One such document noted the difficulty of creating a product such as Level2. As one document, drafted by a United attorney, noted, "we have many of the essential elements already in use" but that "combining them into the product and making sure they can operate at some scale will be magic sauce."

52.     These trade secrets (i) are not generally known or readily ascertainable; (ii) are subject to reasonable measures to protect their confidentiality; and (iii) derive independent economic value from their confidentiality.

53.     The compilation of data and information Ehlert and Pollmann misappropriated from United, which took years of labor and investment to create, is itself a trade secret and subject to trade-secret protection.

## VIII.     Ehlert and Pollmann Form a Series of Entities.

54.     Shortly after sending this material to Scott Schneweis, Ehlert and Pollmann began setting up a series of shell entities. On information and belief, those entities were established to profit from United's confidential information and trade secrets. Further, on information and belief, these entities are alter egos of one another and were structured to hide their true purpose.

55.     The first such entity was called "Health Stealth Co," located in Minneapolis, Minnesota.



Health Stealth Co
Moving people through ideas
Social Networking Platforms · Minneapolis, MN · 3K followers · 51-200 employees

56.     As detailed in job postings, Health Stealth Co sought to operationalize many of the insights Ehlert and Pollmann had gained while working at United. For instance, as detailed in one job posting, "The primary objective of the Biometrics domain is to provide tools and support to community members to be able to measure physiological changes and gain and share actionable insights regarding the impact of their lifestyle-related actions. This will be accomplished via a variety of AI/ML-driven means and will require the development of a range of capabilities including seamless hardware integrations with 3rd party solutions (e.g. health wearables, activity trackers, online/at-home assessments, etc.) . . . ."

57.     The hiring manager for the positions at "Health Stealth Co" was hired from DexCom, a Level2 customer and Level2's CGM vendor.

58.     In January 2022, Ehlert and Pollmann set up Sequelae, Inc., and Sequelae LLC, whose sole manager was Mark Pollmann operating out of his home in Brooklyn Park, Minnesota. In March 2023, Sequelae, Inc. was registered as a foreign corporation in

California, with a mailing address in Minnesota. The Sequelae website—recently shut down once United began investigating—is also registered to Mark Pollmann.

59.     In April 2022, Ehlert and Pollmann set up Lore Health LLC and Lore Health ACO LLC. Both are operated out of Ehlert and Pollmann's homes in Minnesota.

60.     On information and belief, Ehlert and Pollmann have set up, either directly or through their agents, additional shell companies, including RCC Lore Healthcare LLC, Lore Inc., and Lore Café Lounge. On information and belief, these entities were also established to profit from United's confidential information and trade secrets.

61.     On information and belief, the Defendant entities operated as agents of the other, were third-party beneficiaries of the contracts they signed, or conspired with each other to harm United in that (i) they agreed to commit unlawful acts, (ii) torts or criminal acts occurred, and (iii) United has been hurt or damaged.

## IX.   Lore Health Was Established to Profit from United's Confidential Information and Trade Secrets.

62.     On information and belief, the Sequelae and Lore Health entities were created to profit (and do, in fact, profit) from United's confidential information, especially as it relates to type-2 diabetes.

63.     In November 2022, by which time Lore Health had been making sale pitches in several states, Ehlert was interviewed by the FutureHealth Podcast. On the podcast, without disclosing his affiliation with Lore Health, Ehlert teed up the problem of diabetics and their related conditions:

> When we know that it's not just hypertension but generally the combination of diabetes and hypertension together that causes somebody to progress down that track relatively quickly, then we might say, "Well, if I have a stage

one patient that has pre-diabetes, now what do I do with them? Is there some engagement that needs to happen at home?" There's a really big problem, which is we don't, at least in this country, we don't have a pre-diabetes, stage one kidney disease intervention that's gone through the FDA. So, there's nothing in the dropdown list if you're the doctor to actually do. So, there's the fallback, which everybody knows, we need to tell this patient to eat better, sleep better, exercise more, and we'll see you in six months. There might be ways in there that we could talk about how do we engage digitally in-between those things.

64.     In the interview, Ehlert touted wearables such as the CGMs used in the Level2. As Ehlert noted,

CGM is a great example of digital health that has actually improved outcome for the actual patient. Now, there's different issues that relates to payers and as it relates to the providers around CGM, and we could talk about that for a minute. But for the patient itself, you look at what is accomplished there. . . . [T]hey are actually getting an improved outcome as a consequence. That technology was originally built for type 1 patients and it's been now looked at and used with type 2 patients in different areas. But that's a good example of, we should be asking the question of where else could the patient actually do something different? And I think there's a really key question in there, which is that type 1 patient who's on insulin needs to change their behavior in some way and CGM allows them to do just that. So, the question that you would apply then is say, "What other behaviors could CGM or something like it change a core behavior that needs to happen in there?" There are a number of examples where you could do that. CGM is not the only example though. You could take another one as long as you went with something that's popular and relatively well-known.

65.     Throughout the interview, Ehlert touted the financial opportunity around delegated-risk programs like Level2: "I reduce the medical spend from 84% to 83%, the payer can actually keep that savings that they actually generate in there. So, what you said is correct, the payer does have an incentive to actually go and invest into things, but there are limits to where they will make those investments and where they will not. Anything

that falls in the efficiency zone where every dollar they save, they can keep, that's free game."

66. Shortly thereafter, in December 2022, Lore Health released its first app, which was developed by Sequelae LLC, as identified on the Apple App Store:



67. Sequelae also publicly refers to itself as "Sequelae, DBA Lore Health."

68. On information and belief, the related shell companies set up by Ehlert and Pollmann since leaving United, are alter egos of one another in that they: (i) have insufficient capitalization; (ii) have failed to observe corporate formalities; (iii) siphon funds to the dominant shareholder; (iv) have non-functioning boards of directors and overlapping officers; (v) lack corporate records; and (vi) were created to mask the true nature of their dealings. The failure to pierce the corporate veil would work an injustice.

**X.   Lore Health Competes Against Level2 Using United's Own Confidential Information and Trade Secrets Against It.**

69. Lore Health competes with Level2.

70.     Lore Health's business model closely follows that of Level2. As reflected in the below screenshot, Lore Health claims to have "cracked the code on the payment model for lifestyle medicine providers" and offers delegated risk platforms to, among others, "commercial plans."



Lore has cracked the code on the payment model for lifestyle medicine providers. Lore is an online community where people explore healthy lifestyle ideas and work to improve their health between clinical touchpoints. To help incentivize healthy behaviors, Lore members can earn hundreds of dollars in healthy groceries for using tools like in-home tests and biosensors that measure how well their health actions are working. Along with the first national lifestyle medicine ACO, Lore now also offers delegated risk programs to existing ACOs, Medicare Advantage plans, and other commercial plans—with guaranteed savings for all groups.

Home | Lore Health (lorehealthcare.com)

71.     Lore Health is engaged in the business of "addressing chronic diseases, such as diabetes . . . , through lifestyle medicine interventions, appropriate utilization of care and improved care coordination." 2023 Accountable Care Organization Budget Order (the "Budget Order"), *available at* [FY23 ACO Budget Order Lore Health Docket No. 21-002 (1).pdf (vermont.gov).](FY23 ACO Budget Order Lore Health Docket No. 21-002 (1).pdf (vermont.gov).)

72.     Lore Health operates by providing a software platform using Fitbit, Dexcom CGM, or similar wearable technology that allows enrollees to engage in "curated interactions between them and others on the platform" and to participate in a chronic disease management program. *Id.* Through tracked data and interaction, users are encouraged to change behaviors and lessen health risks.

73.     Lore Health provides a fee-for-service model, and in doing so, assumes all the risk associated with an enrollee's related healthcare needs. *Id.*

74.     The Lore Health website has a page instructing participants on how to use the Dexcom CGM device to post and "share [their] results on Lore." The web page also indicates that users can use their CGM graph to see "how your blood sugar levels change over the course of the day, . . . offering a great visual demonstration of how lifestyle habits affect your blood sugar." *Id.*

75.     The Budget Order reveals that Lore Health has already been approved to provide program services in five states.

76.     The key features of Lore Health are almost identical to Level2, including: (a) combining Fitbits or Dexcom CGM devices with access to providers, clinicians, and coaches; (b) encouraging the use of lifestyle-based medicine, including nutrition, sleep, physical activity, and stress management; (c) developing and operating communities of like persons through an online social network model to allow patients to share and support each other, and to engage in activities that improve health; (d) assuming all the insurability risks of enrollees; and/or (e) utilizing behavior change to improve lifestyle and health supported by social connections, biofeedback, and offering incentives to participants to get them engaged.

77.     The following chart reflects characteristics of Level2 duplicated by Lore Health:

| CHARACTERISTICS | level2 | LORE Contagious health |
|---|---|---|
| Encourages lifestyle-based medicine | ✓ | ✓ |
| Uses a social network community | ✓ | ✓ |
| Changes behavior through social connections, biofeedback, and incentives. | ✓ | ✓ |
| Serves Type 2 diabetics and related conditions | ✓ | ✓ |
| Developing offerings for commercial plans, Medicare Advantage, and Medicare | ✓ | ✓ |
| Offers delegated risk programs with guaranteed savings | ✓ | ✓ |
| Uses DexCom CGMs and Fitbits | ✓ | ✓ |

78.    Lore Health is engaged in a business that competes or seeks to compete directly with Level2 and other related businesses in which United is involved.

## VI.    Lore Health Misappropriated United's Confidential Information and Trade Secrets and Tortiously Interfered with United's Agreements

79.    Lore Health has tortiously interfered with Ehlert's and Pollmann's obligations under the Equity Purchase Agreement and Ehlert's and Pollmann's Employment Agreements.[1]

80.    As detailed above, Lore Health competes with United's Level2 in breach of Ehlert's and Pollmann's restrictive covenants.

81.    Lore Health has also directly solicited the employment of additional former United personnel by inducing and attempting to induce them to leave their employment at United and move to Lore Health. Such United personnel includes, but is not limited to,

---

[1] Specifically, Lore Health tortiously interfered with Ehlert's and Pollmann's obligations related to competition, return of property, misuse of United's confidential information, and non-solicitation of employees and customers.

former United employees Mike Christy, Scott Archibald, Will Ferguson (the first head of sales at Level2), and Natalie Sheils.

82.     Former United employee Natalie Sheils's LinkedIn professional profile lists her current employer since August 2022 as "Stealth," which, upon information and belief, refers to Lore Health by its previous name, "Health Stealth Co."

83.     At least one other United employee has also been recruited to join Lore Health. On or about May 19, 2023, a current United employee met Ehlert (at the employee's request) at Ehlert's home in Minnesota to discuss the employee's potential employment at Lore Health, including specific details such as a potential offer of employment, compensation for the position, and the structure of a role at Lore Health.

84.     During this meeting, Ehlert indicated to the employee that Ehlert's assistant and former United employee, Karen Shorten, would follow up with the employee to schedule additional meetings with other Lore Health employees, including Pollmann and former United employee, Mike Christy. The United employee then met with Pollmann and others to discuss his potential employment at Lore.

### XI.    Ehlert and Pollmann Cover Their Tracks.

85.     From the founding of Lore Health to the present, Ehlert and Pollmann made substantial efforts to hide their involvement with Lore Health.

86.     As a front, they recruited several doctors to be the face of the organization. They even provided a sham address in San Diego, California, as Lore Health's "location." It is not Lore Health's location, but rather the address of a San Diego law firm. Lore Health is run by Ehlert and Pollmann out of their homes in Minnesota.

87.     The Lore Health website says nothing about Ehlert and Pollmann's involvement. In fact, it says nothing about the involvement of any of the at least *seven* (and probably more) former United employees who currently work there. The website, like the mailing address and the public-facing team, is a front.



88.     Once United discovered Ehlert and Pollmann's work at Lore Health and their theft of United's confidential information and trade secrets, Ehlert and Pollmann tried to cover up their wrongdoing.

89.     Over the course of 2023, Pollmann erased incriminating information. Information regarding Dexcom was scrubbed from the Lore Health website. The Sequelae website was disabled. Most concerningly, Pollmann secretly conferred with the United employee he had pressured to provide the misappropriated information on a hard drive.

90.     Ehlert and Pollmann took these steps to cover up their wrongdoing as agents for Lore Health. As a result of their intentional destruction of evidence and witness interference, it may never be possible to know the full extent of the damage Lore Health caused United.

**FIRST CAUSE OF ACTION**
**Misappropriation of Trade Secrets**

91.     United realleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

92.     United's trade secrets include information regarding (a) the nature of the business case for Level2, (b) the means and manner of operationalizing the business opportunity, (c) financial, organizational, and strategic planning documents, (d) data insights and analysis, (e) clinical data, interventions, and micro-interventions, and (f) actuarial and pricing documents.

93.     United's trade secrets do not include patented material.

94.     This confidential information is not generally known to and not readily ascertainable by persons who can obtain economic value from its disclosure or use, and therefore has economic value to United.

95.     The confidential information accessed and used by Lore Health constitutes trade secrets of United under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, and the Minnesota Uniform Trade Secrets Act, Minn. Stat. § 325C.01-.08.

96.     United's trade secrets are related to products or services used in, or intended for use in, interstate or foreign commerce.

97.     As detailed above, United made reasonable efforts to ensure the secrecy of its internally created confidential information accessed and used by Lore Health.

98.     Upon information and belief, Lore Health has acquired by improper means, and has used or is planning to use, United's trade secrets when Lore Health knew, or had reason to know, that the trade secrets were obtained without authorization. Such actions constitute misappropriation of United's trade secrets.

99.     Lore Health's misappropriation of United's trade secrets has been willful and malicious.

100.     As a result of Lore Health's misappropriation of United's trade secrets, United has suffered and will continue to suffer damages, including compensatory, incidental and consequential damages, and actual losses and damages for the losses to United caused by Lore Health's conduct, such as, but not limited to, actual and/or future lost sales and profits. Moreover, United is entitled to recoup the value of the unjust enrichment Lore Health gained from this misappropriation, including Lore Health's saved development costs, enhanced customer sales relationships, and/or actual and/or future increased sales and profits. Additionally, or in the alternative, United is entitled to a reasonable royalty for the use of any of United's trade secrets. United is further entitled to exemplary damages under the DTSA and MUTSA, and punitive damages under Minnesota law.

101.     United will suffer irreparable harm absent injunctive relief and is entitled to an injunction to prevent Lore Health's misappropriation and threatened further misappropriation, and to prevent the value of United's trade secrets from continuing to inure unfairly to Lore Health's benefit.

102.    In addition, United has incurred, and will continue to incur, attorneys' fees and related costs in prosecuting its misappropriation of trade secrets claim.

**SECOND CAUSE OF ACTION**
**Unjust Enrichment**

103.    United realleges and incorporates by reference herein the allegations contained in the paragraphs above as though fully set forth herein.

104.    United also asserts this claim to recover the substantial expense incurred to acquire and develop its confidential information (a) in the alternative to United's trade secret claim, and/or (b) to the extent that any misappropriated confidential information is not found to be a trade secret.

105.    As a result of the unlawful activities described above, including their acquisition and use of United's confidential information to which it had no right, Lore Health has intentionally and unjustly enriched itself at United's expense by the funds and other benefits it has received and will receive because of its unlawful conduct.

106.    United's unjust enrichment damages from Lore Health's statutory violations, tortious interference, and other wrongful conduct include Lore Health's avoided research and development costs, enhanced customer sales relationships, and/or actual and/or future increased sales and profits, as well as other unjust enrichment Lore Health has enjoyed because of its wrongful conduct.

107.    It would be unjust for Lore Health to retain the benefits it has received as a direct and proximate result of its wrongful conduct alleged above.

**THIRD CAUSE OF ACTION**
**Tortious Interference with Contract**

108.    United realleges and incorporates by reference herein the allegations contained in the paragraphs above as though fully set forth herein.

109.    United asserts this claim (a) in the alternative to United's trade secret claim, (b) to the extent that any misappropriated confidential information is not found to be a trade secret, and/or (c) to the extent the challenged conduct (as with non-solicitation) does not implicate United's trade secrets.

110.    Lore Health is not a party to the Employment Agreements between Ehlert and United.

111.    Lore Health is not a party to the Employment Agreement between Pollmann and United.

112.    Lore Health knew, or should have known, about the Employment Agreements between Ehlert and United.

113.    Lore Health knew, or should have known, about the Employment Agreement between Pollmann and United.

114.    Ehlert's and Pollmann's Employment Agreements with United were supported by adequate consideration and are enforceable.

115.    Under the terms of their Employment Agreements with United, Pollmann and Ehlert had continuing contractual obligations to maintain the confidentiality of United's confidential information, not use United's confidential information, and to return all United information post-termination as well as non-solicitation and non-competition obligations.

116.    Lore Health has interfered with, and if not enjoined will continue to interfere with, Ehlert's and Pollmann's obligations to United as set forth in the Employment Agreements.

117.    Lore Health intends to harm United by interfering with Ehlert's and Pollmann's contractual obligations to United.

118.    Lore Health intentionally procured the breach of those contractual obligations by acquiring and using United's confidential information that it knew, or should have known, was acquired in violation of Ehlert's and Pollmann's contractual obligations to United.

119.    Lore Health's interference was and is improper and without justification or excuse. Lore Health interfered with Ehlert's and Pollmann's contractual obligations with the intent of injuring United and improperly gaining a competitive and economic advantage at United's expense.

120.    United sustained damages because of Lore Health's interference with Ehlert's and Pollmann's contractual obligations to United, including compensatory, incidental, and consequential damages, and actual losses and damages for the losses to United caused by Lore Health's conduct, such as, but not limited to, actual and/or future lost sales and profits.

## FOURTH CAUSE OF ACTION
### Unfair Competition

121.    United realleges and incorporates by reference herein the allegations contained in the paragraphs above as though fully set forth herein.

122. United asserts this claim (a) in the alternative to United's trade secret claim, (b) to the extent that any misappropriated confidential information is not found to be a trade secret, and/or (c) to the extent the challenged conduct (as with non-solicitation) does not implicate United's trade secrets.

123. Lore Health's tortious interference with Ehlert's and Pollmann's Employment Agreements, as alleged herein, constitutes an unfair method of competition.

124. Defendants' actions in misappropriating and utilizing United's trade secrets and confidential information constitute an unfair method of competition.

125. Lore Health's actions, as alleged herein, were unfair under all of the facts and circumstances, in that Lore Health acted in bad faith, inequitably, and in a manner that undermines the ethical standards and good faith dealings between parties engaged in competition.

126. Lore Health's unfair methods of competition affected commerce.

127. As a direct and proximate result of Lore Health's unfair methods of competition, United was harmed in its competition with Lore Health.

128. Lore Health's actions in misappropriating United's trade secrets, and in tortiously interfering with Ehlert's and Pollmann's Agreements with United, were done willfully.

129. As a direct and proximate result of Lore Health's unfair methods of competition, United has been damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### Accounting

130.　United realleges and incorporates by reference herein the allegations contained in the paragraphs above as though fully set forth herein.

131.　As a result of Lore Health's misappropriation of United's trade secrets and confidential information, United lacks information necessary to determine where its trade secrets and confidential information were transferred and stored, who had access to such trade secret and confidential information, and what was been done with such trade secrets and confidential information.

132.　In addition, because of the series of shell entities Ehlert and Pollmann formed to hide their unlawful activity, United lacks information necessary to determine which entities benefited from the unlawful activity and to what extent.

133.　Lore Health has access to information about where United's trade secrets and confidential information were transferred and stored, who had access to such trade secret and confidential information, and what was done with such trade secrets and confidential information.

134.　Lore Health also has access to information regarding which entities benefited from the unlawful activity and to what extent.

135.　As a result, United is entitled to the equitable remedy of accounting.

## SIXTH CAUSE OF ACTION
### Conspiracy

136.　United realleges and incorporates by reference herein the allegations contained in the paragraphs above as though fully set forth herein.

137.     Lore Health was engaged in a civil conspiracy to accomplish some concerted action, which injured United.

138.     Lore Health committed and executed tortious acts in pursuance of certain torts as previously delineated against United.

139.     Lore Health did conspire and agree to commit such acts.

140.     That as a direct and proximate result thereof, United has sustained injuries set forth in this complaint.

**WHEREFORE,** United prays for an award as follows:

1.     An order: (a) preliminarily and permanently enjoining Lore Health from: accessing, using, or disclosing any United trade secrets or confidential information; (b) ordering Lore Health to immediately return all United property to United; (c) ordering Lore Health to fully and completely disclose the locations where United's trade secrets and confidential information were transferred and stored, who had access to such trade secret and confidential information, and what was done with such trade secrets and confidential information; (d) otherwise protecting United's trade secrets and confidential information from Lore Health's wrongful conduct; and, (e) and ordering an accounting;

2.     A judgment against Lore Health for all damages proximately caused by its wrongful actions, for all amounts by which it may have been unjustly enriched, and prejudgment interest;

3.     For punitive and/or exemplary damages;

4.     For attorneys' fees and costs; and

5.     For such other and further relief as the Court may deem just and proper.


DATED: December 28, 2023          **FAEGRE DRINKER BIDDLE & REATH LLP**


By: */s/ Randall E. Kahnke*
Randall E. Kahnke (#202745)
Charles F. Knapp (#0220371)
John W. Ursu (#32257X)
Peter C. Magnuson (#0392342)

-36-

Kiera K. Murphy (#0401027)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
randall.kahnke@FaegreDrinker.com
chuck.knapp@FaegreDrinker.com
john.ursu@FaegreDrinker.com
peter.magnuson@FaegreDrinker.com
kiera.murphy@FaegreDrinker.com

Angela Kelver Hall (#26991-71) (*pro hac vice* forthcoming)
Jane Dall Wilson, No. 24142-71 (*pro hac vice* forthcoming)
300 North Meridian Street, Suite 2500
Indianapolis, IN 46204
Telephone:  (317) 237-0100
angela.hall.@FaegreDrinker.com
jane.wilson@FaegreDrinker.com

*Attorneys for UnitedHealth Group, Inc. & United HealthCare Services, Inc.*